## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JPMORGAN CHASE & CO.,

                Plaintiff,

       v.

CITY OF RICHMOND AND THE
RICHMOND JOINT POWERS
FINANCING AUTHORITY,

                Defendants.

Case No. 1:26-cv-1143

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPLAINT

Plaintiff JPMorgan Chase & Co. ("JPMorgan"), by and through its undersigned attorneys, files this Complaint against Defendants City of Richmond and the Richmond Joint Powers Financing Authority (together, "Richmond" or "Defendants"), and alleges as follows on knowledge as to its own acts and on information and belief as to all others:

### INTRODUCTION

1.      This action arises from Defendants' breach of a comprehensive settlement agreement fully and finally resolving its claims concerning interest rate swaps and certain other transactions, and Defendants' attempt to litigate released claims in another forum.

2.      On December 14, 2015, JPMorgan entered into a settlement agreement (the "Settlement Agreement") resolving claims asserted by various California municipal entities, including Defendant City of Richmond, in *In re Municipal Derivatives Antitrust Litigation*, MDL No. 1950, Master Dkt. No. 08-02516 (VM) (GWG) (S.D.N.Y.) (the "MDL"). The Settlement Agreement was intended to—and did—achieve a broad, final, and global resolution of claims asserted in the settled actions and all possible claims by the settling California municipal entities

relating to "Municipal Derivative Transactions"—defined to include swaps and "all of the types of transactions" described in the complaints of the settling California municipal entities. (Ex. A §§ A(1)(f), A(1)(h) (Settlement Agreement).) The Settlement Agreement also released claims "relating in any way to any conduct alleged in the Actions or that *could have* been alleged in the Actions." (*Id.* § A(1)(k) (emphasis added).) In exchange for valuable consideration, the City of Richmond and its Related Entities (including the Richmond Joint Powers Financing Authority) expressly released and covenanted not to sue JPMorgan and its affiliates with respect to any such claims. The Settlement Agreement further provided that Richmond would be permanently barred and enjoined from instituting, commencing, or prosecuting any such released claims. (*Id.* § B(3).)

3.       Notwithstanding those provisions, through its City Attorney, Richmond has filed and is prosecuting an action against JPMorgan in the United States District Court for the Northern District of California (the "California Action") asserting claims that fall squarely within the scope of the Settlement Agreement's release and covenant not to sue. *See City of Richmond, et al.* v. *Royal Bank of Canada, et al.*, Case No. 3:25-cv-03380-CRB (N.D. Cal.).[1] In the California Action, Richmond alleges that interest rate swaps entered into with JPMorgan's predecessor in 2007 in connection with Richmond's municipal pension obligation bonds were ultra vires and void, and that payments made under those swaps constituted false claims under the California False Claims Act, Cal. Gov't Code § 12650 *et seq*.

---

[1]    The original California Action complaint named a non-specific entity, "JPMorgan Chase," as a defendant and the amended California Action complaint names "JPMorgan Chase & Co." as a defendant. Whether either named party is a correctly named defendant in the California Action is not necessary to this Action because "Releasees" is defined broadly in the Settlement Agreement to include JPMorgan Chase & Co., J.P. Morgan Securities LLC, and "their direct and indirect parents, subsidiaries, affiliates, and predecessors," as well as others. (Ex. A at 1, §§ A(1)(c), A(1)(l).)

4.      Richmond's claims in the California Action directly contravene the Settlement Agreement because they arise out of "Municipal Derivative Transactions" or relate to conduct that was alleged, or could have been alleged, in the MDL.  Although Richmond's complaint in the California Action suffers from multiple other defects, not the least of which is that it is time-barred, the Settlement Agreement vests this Court with "exclusive jurisdiction over the implementation and enforcement" of the Settlement Agreement, making the release and covenant not to sue a threshold issue that must first be presented here.  (Ex. A §§ F(2)-(3).)

5.      JPMorgan initially sought leave to enforce the release and covenant not to sue by way of motion in the action in which the Settlement Agreement was originally entered but the Court (Marrero, J.) ruled that enforcement of the Settlement Agreement must be brought in an independent action.  (MDL Dkt. No. 2080.)  Accordingly, JPMorgan brings this action for breach of contract and declaratory relief confirming that Richmond's claims are barred by the Settlement Agreement and enjoining their continued prosecution.

## THE PARTIES

6.      Plaintiff JPMorgan Chase & Co. is a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York.

7.      Defendant City of Richmond is a municipal corporation and political subdivision of the State of California.  The City of Richmond also claims to bring the California Action as "Successor Agency to the Richmond Community Redevelopment Agency," a dissolved agency that is also a releasor under the Settlement Agreement.  (Ex. B ¶¶ 13, 16 (amended California Action complaint); Ex. A §§ A(1)(j), A(1)(m).)

8.      Defendant Richmond Joint Powers Financing Authority is a joint powers authority created pursuant to California law by and among public entities, including the City of Richmond, and is an agency or instrumentality thereof.

## JURISDICTION AND VENUE

9.      This Court has original subject-matter jurisdiction under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000, exclusive of interest and costs.  In the California Action, Richmond seeks to recoup millions of dollars in alleged payments and termination fees made under the challenged transactions.  (*See* Ex. B ¶ 11-12.)  Complete diversity exists because JPMorgan is a citizen of Delaware and New York, while Defendants are citizens of California. *See Moor* v. *Cnty. of Alameda*, 411 U.S. 693, 717 (1973) ("[T]his Court has recognized that a political subdivision of a State, unless it is simply 'the arm or alter ego of the State,' is a citizen of the State for diversity purposes."); *Jordan* v. *Chase Manhattan Bank*, 2014 WL 3767010, at *5 (S.D.N.Y. July 31, 2014) ("JPMorgan Chase & Co. is a citizen of both New York and Delaware for diversity purposes.").

10.     This Court has personal jurisdiction over Defendants because the Settlement Agreement provides that the parties "irrevocably submit to the exclusive jurisdiction of the Court" for any suit, action, proceeding, or dispute arising out of or relating to the Settlement Agreement or its applicability.  (Ex. A § F(2).)

11.     The Settlement Agreement further provides that this "Court"—defined as the "United States District Court for the Southern District of New York (Marrero, J.)"— "shall retain exclusive jurisdiction over the implementation and enforcement of this Agreement," making this Court the sole forum authorized to adjudicate disputes concerning the scope or effect of the release and covenant not to sue contained in the Settlement Agreement.  (*Id.* §§ A(1)(b), F(3).)

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because (i) a substantial part of the events giving rise to the claims occurred in this District, including the underlying MDL, and (ii) the Settlement Agreement's forum-selection clause designates this Court as the exclusive venue to adjudicate this dispute.

## RELEVANT FACTS

13.     Beginning in 2008, numerous California municipal entities, including the City of Richmond, filed actions against JPMorgan, asserting claims concerning municipal derivative transactions, including interest rate swaps, guaranteed investment contracts, forward delivery agreements, and other structured financial products used by municipalities to invest bond proceeds or hedge interest-rate risk.  Those actions, and many others, were consolidated before this Court as *In re Municipal Derivatives Antitrust Litigation*, MDL No. 1950, Master Dkt. No. 08-02516 (VM) (GWG) (S.D.N.Y.).  Richmond and the other California municipal plaintiffs who sued JPMorgan more than fifteen years ago were represented in the MDL by common counsel.

14.     In its operative complaint in the MDL, Richmond asserted claims broadly challenging "all of the Municipal Derivative transactions entered into by Richmond."  (MDL Dkt. No. 1300 at 171.)

15.     To resolve actions brought by the settling California municipal entities, JPMorgan and nineteen plaintiffs, including Richmond and its related agencies, entered into the Settlement Agreement on December 14, 2015.  (*See generally* Ex. A.)

A.     **Relevant Terms of the Settlement Agreement**

16.     "Releasors" is defined in the Settlement Agreement to include Plaintiffs (including the City of Richmond and other settling California municipal entities, represented by the same counsel), Related Entities (including the Richmond Joint Powers Financing Authority and Richmond Community Redevelopment Agency), and others, including "attorneys" and "legal representatives."  (Ex. A §§ A(1)(h), A(1)(j), (A)(1)(m).)

17.     The Settlement Agreement defines "Municipal Derivative Transactions" broadly to include:  "any transactions that government, quasi-government, non-profit, private and other entities eligible to issue tax-exempt debt now use or have used at any time since January 1,

1992 to (i) invest the proceeds of tax-exempt debt offerings or (ii) hedge or manage the interest rate risk associated with such debt offerings." (*Id.* § A(1)(f).)  The definition includes interest rate swaps and "all of the types of transactions described in the complaints and amendments thereto filed by Plaintiffs in the Actions." (*Id.*)

18.    The Settlement Agreement defines "Released Claims" to include "any and all manner of claims" of the Releasors against the Releasees concerning conduct arising out of or relating in any way to the purchase or sale of Municipal Derivative Transactions during the period from January 1, 1992 to the Effective Date (December 14, 2015). (*Id.* § A(1)(k).)

19.    The definition of Released Claims also expressly includes claims "relating in any way to any conduct alleged in the [MDL] Actions or that could have been alleged in the [MDL] Actions," and expressly encompasses claims arising under "any other federal or state statute or common law." (*Id.*)

20.    Section B(3) of the Settlement Agreement provides that, upon the Effective Date:  "the Releasors . . . shall be deemed to have wholly, finally, and forever released, relinquished, and discharged all Released Claims against the Releasees and shall have covenanted not to sue the Releasees with respect to all such Released Claims, and shall be permanently barred and enjoined from instituting, commencing, or prosecuting any such Released Claim against the Releasees." (*Id.* § B(3).)

21.    In short, in return for paying plaintiffs in the MDL, including Richmond, an agreed upon sum of money, JPMorgan bargained for and obtained complete peace from—and an inviolable commitment that it would never again be subjected to—any claims of any type that Richmond had, might have, or had but did not know about, against any JPMorgan entity based in

any way on any Municipal Derivative Transaction entered into by Richmond after January 1, 1992, or any claims that could have been asserted in the MDL.

B. **Richmond Filed the California Action in Violation of the Settlement Agreement**

22.     Notwithstanding its 2015 release, on March 17, 2025, Defendants filed suit against JPMorgan and the Royal Bank of Canada ("RBC") in California state court.  JPMorgan and RBC removed the action to the Northern District of California prior to service.  On December 5, 2025, Richmond filed the operative amended complaint in the California Action.  JPMorgan accepted service of the amended complaint on December 29, 2025.

23.     As against JPMorgan, Richmond alleges in the California Action that interest rate swaps entered into in 2007 in connection with Richmond's Series 2005 Pension Obligation Bonds (the "POBs") were ultra vires and therefore void under California law, and that JPMorgan fraudulently induced Richmond to enter into those swaps by failing to disclose material information regarding the risks, legality, and consequences of the transactions.  (*See* Ex. B.) Richmond further alleges that JPMorgan submitted repeated claims for payment under the swaps over a period of years, and that each such demand for payment constituted an impliedly false certification that the swaps were valid and legally enforceable.  (*See id.*)  On that basis, Richmond contends that all payments made to JPMorgan under the swaps, including the final payments allegedly made in or about 2016, violated the California False Claims Act and are subject to recoupment, even though the underlying transactions were entered into nearly two decades ago and JPMorgan is not alleged to have submitted any requests for payment or received any payments in the past nine years.  (*See id.*)

24.     The swaps challenged in the California Action fall squarely within the Settlement Agreement's definition of Municipal Derivative Transactions which, as noted above,

means (i) transactions (ii) that government entities eligible to issue tax-exempt debt (iii) used at any time since January 1, 1992 (iv) to hedge or manage the interest rate risk associated with tax-exempt debt offerings.  Here, the swaps were entered into by Richmond—a government entity eligible to issue tax-exempt debt—in 2007.  Richmond admits that the swaps were entered into to hedge interest-rate risk associated with municipal debt.  (Ex. B ¶¶ 228-42.)  And the underlying POBs were tax-exempt debt offerings, as they were exempt from state income tax.

25.    Although many tax-exempt bond offerings are both state and federally tax-exempt, bonds like the Richmond POBs that are state tax-exempt but federally taxable are tax-exempt debt offerings under the broad terms of the Settlement Agreement.  In fact, the Settlement Agreement expressly brings within its scope "all of the types of transactions described in the complaints."  (Ex. A §§ A(1)(f), A(1)(k).)  In the different MDL complaints filed by the settling California municipal entities (all of which were represented by the same counsel), the municipal plaintiffs alleged specific examples of tax-exempt debt offerings that were state tax-exempt but federally taxable and their associated Municipal Derivative Transactions.  For example, the City of Riverside, The Redevelopment Agency of the City of Riverside, and the Public Financing Authority of the City of Riverside pleaded claims based on a forward purchase and sale agreement related to the City of Riverside's Taxable Pension Obligation Bonds 2005 Series A, which, just like the Richmond POBs, were federally-taxable pension obligation bonds that were state tax-exempt.  (MDL Dkt. No. 1301 at 206-07.)  Likewise, the City of Stockton, the Redevelopment Agency of the City of Stockton, and the Public Financing Authority of the City of Stockton each raised claims based on guaranteed investment contracts tied to Stockton bond series

that were subject to federal tax but exempt from state tax.  (MDL Dkt. No. 1296 at 168-69, *id.* Dkt. No. 1297 at 168-69.)[2]  These claims were resolved by the Settlement Agreement.

26.    In other words, as the transactions expressly referenced in those complaints confirm, a bond issued by a California municipal entity that is state tax-exempt is a tax-exempt bond under the Settlement Agreement, even if it is not federally tax-exempt.  By incorporating "all of the types of transactions described in the complaints," the Settlement Agreement leaves no doubt that the Richmond POBs, which are exactly the same character as state tax-exempt offerings described in other of the settling plaintiffs' complaints, are tax-exempt offerings and the associated swaps that Richmond now challenges are Municipal Derivative Transactions barred by the 2015 release and covenant not to sue.

27.    The broad release to which Richmond agreed in the Settlement Agreement also independently and unambiguously releases claims "relating in any way to any conduct alleged in the Actions or that could have been alleged in the Actions."  (Ex. A § A(1)(k).)  That language also bars Richmond's claims against JPMorgan in the California Action.

28.    Here, Richmond could have brought all of the claims it now asserts against JPMorgan in the MDL.  Both proceedings concern identical financial instruments—interest rate swaps entered into in the municipal finance context during the time period covered by the Settlement Agreement.  In both the MDL and the California Action, Richmond alleges misconduct by financial institutions in connection with the marketing and execution of those instruments.  And in both proceedings, Richmond seeks to recover damages centered on payments made under these transactions.  While the MDL and Richmond's new California Action assert different legal

---

[2]    Like Richmond, both Riverside and Stockton settled their claims against JPMorgan pursuant to the same settlement agreement and their claims were likewise dismissed. (MDL Dkt. No. 1984.)

theories, the alleged factual predicate is the same:  alleged misconduct by JPMorgan in connection with municipal derivative transactions and the extraction of payments from Richmond pursuant to those transactions, with the alleged factual predicate known or reasonably knowable to Richmond at the time of the MDL and settlement.

29.    The Settlement Agreement expressly forecloses attempts to relitigate conduct associated with all Municipal Derivative Transactions since January 1, 1992—under any alternative statutory or common-law theories.  (Ex. A § A(1)(k) (releasing "all claims" under "any other federal or state statute or common law").)  Defendants' California False Claims Act theory therefore represents not a new dispute, but an effort to raise new claims as to the same transactions that were resolved by the Settlement Agreement.

30.    There is no carve-out in the Settlement Agreement that would exempt the claims against JPMorgan in the California Action from the release.

31.    JPMorgan has already incurred attorneys' fees in the California Action (and a related action filed by Richmond) as a result of Richmond's breach of the Settlement Agreement.[3]

32.    The Settlement Agreement achieved a global resolution to the settling California municipal entities' claims.  If Richmond is allowed to breach the Settlement Agreement, Richmond and other California municipalities that are parties to the Settlement Agreement could file successive lawsuits asserting any manner of claims relating to interest rate swaps and other transactions tied to federally taxable bonds, thereby permitting duplicative recovery and exposing

---

[3]    Richmond no longer asserts any claims against JPMorgan in the related action, *City of Richmond, et al.* v. *Royal Bank of Canada*, *et al*., Case No. 3:25-cv-03348-CRB (N.D. Cal.).  However, in breach of the Settlement Agreement Richmond originally named JPMorgan in that action before dropping JPMorgan in an amended complaint.

JPMorgan and other financial institutions to substantial costs notwithstanding having bargained and paid for a settlement.

33.    Prior to commencing this action, JPMorgan demanded that Defendants dismiss the claims in the California Action against JPMorgan.  Defendants declined to do so.

## FIRST CAUSE OF ACTION

### Breach of Contract

34.    JPMorgan realleges and incorporates by reference Paragraphs 1 through 33.

35.    The Settlement Agreement is a valid, binding, and enforceable contract between JPMorgan and Defendants.

36.    The City of Richmond and the Richmond Joint Powers Financing Authority (including the Richmond Community Redevelopment Agency and Richmond's attorneys) are expressly included among the "Releasors" under the Settlement Agreement.  JPMorgan Chase & Co. is expressly included among the "Releasees."

37.    The Settlement Agreement was negotiated at arm's length by sophisticated parties represented by counsel.  The Settlement Agreement is a valid and enforceable contract whose terms bind Defendants.

38.    JPMorgan has fully performed all obligations required of it under the Settlement Agreement.  Among other things, JPMorgan provided the consideration required to effectuate the global settlement of claims asserted against it in the MDL by the settling California municipal entities.  JPMorgan has not breached the Settlement Agreement and has at all times complied with its terms.

39.    The Settlement Agreement contains an unambiguous release and covenant not to sue.  Upon the Effective Date, the Releasors released JPMorgan from all "Released Claims," covenanted not to sue with respect to those claims, and agreed that they would be permanently

barred and enjoined from instituting or prosecuting any such claims. (Settlement Agreement § B(3).)

40.    The claims asserted by Defendants against JPMorgan in the California Action are "Released Claims" under the Settlement Agreement.

41.    By initiating and prosecuting claims in the California Action against JPMorgan that are Released Claims, Defendants have breached the Settlement Agreement.

42.    As a direct and proximate result of Defendants' breach of the Settlement Agreement, JPMorgan has suffered and continues to suffer damages, including but not limited to, attorneys' fees and litigation costs incurred in responding to and defending against the California Action, costs associated with seeking enforcement of the Settlement Agreement, and the loss of the benefit of the finality and repose that JPMorgan bargained for and obtained under the Settlement Agreement.

43.    Defendants' breach has also caused non-quantifiable harm, including the erosion of the certainty, predictability, and finality that the Settlement Agreement was intended to secure, and the risk of inconsistent judicial determinations concerning matters expressly reserved to this Court.

44.    Defendants' breach is ongoing.  As Defendants continue to prosecute the California Action, JPMorgan incurs additional damages and suffers additional harm.

45.    Monetary damages alone are inadequate to remedy Defendants' breach of the Settlement Agreement.

46.    The Settlement Agreement expressly provides that Releasors are "permanently barred and enjoined" from prosecuting released claims, reflecting the parties' mutual understanding that injunctive relief is an appropriate and necessary remedy for breach.

-12-

47.    Absent enforcement of the injunction in the Settlement Agreement against prosecuting Released Claims, Defendants will continue to violate their contractual obligations and undermine the finality of this Court's entry of a stipulation of dismissal with prejudice.

48.    JPMorgan is therefore entitled to injunctive relief enforcing the Settlement Agreement and barring Defendants from continuing to prosecute the California Action or any similar action against JPMorgan based on released claims.

## SECOND CAUSE OF ACTION

### Declaratory Judgment

49.    JPMorgan realleges and incorporates by reference Paragraphs 1 through 48.

50.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that "[i]n a case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration."

51.    This action presents an actual, substantial, and immediate controversy between JPMorgan and Defendants concerning the scope, applicability, and enforceability of the Settlement Agreement, including the release, covenant not to sue, and exclusive jurisdiction provisions.

52.    Defendants have taken the position—by filing and prosecuting the California Action—that the claims they are asserting in the California Action are not Released Claims under the Settlement Agreement.

53.    The controversy between the parties is concrete and ripe.  Defendants are actively prosecuting the California Action and seeking to impose liability on JPMorgan for conduct that was released more than a decade ago.  Absent declaratory relief from this Court, JPMorgan faces the ongoing burden of defending against claims that were released under the Settlement Agreement.

-13-

54.    The parties' dispute is one "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Admiral Ins. Co.* v. *Niagara Transformer Corp.*, 57 F.4th 85, 92 (2d Cir. 2023) (emphasis omitted) (quoting *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 127 (2007)).  Defendants' commencement and continued prosecution of the California Action establish not merely a speculative or hypothetical disagreement, but an existing legal conflict involving adverse legal interests.

55.    Declaratory relief is particularly appropriate here because the Settlement Agreement vests this Court with exclusive jurisdiction over its implementation and enforcement. Resolution of the scope and effect of the release and covenant not to sue is therefore properly— and exclusively—committed to this Court, and a declaration by this Court will conclusively resolve the parties' dispute.

56.    A declaratory judgment will serve a useful and practical purpose by clarifying the parties' respective rights and obligations under the Settlement Agreement, preventing duplicative and inconsistent litigation, and enforcing the finality of this Court's prior order entered in connection with the settlement.

57.    JPMorgan therefore seeks a declaration that:

(a)    The claims asserted by Defendants in the California Action against JPMorgan are Released Claims under the Settlement Agreement;

(b)    Defendants filing and continued prosecution of the California Action against JPMorgan is a breach of Defendants' covenant not to sue JPMorgan on Released Claims; and

(c)    Defendants are permanently barred and enjoined under the express terms of the Settlement Agreement from instituting, prosecuting, or maintaining the

California Action, or any similar action, against JPMorgan or any other Releasees with respect to Released Claims.

58.    Absent declaratory relief from this Court, JPMorgan will continue to suffer ongoing and irreparable harm in the form of continued litigation costs, exposure to inconsistent rulings, and the erosion of the finality and certainty that the Settlement Agreement was intended to secure.

## DEMAND FOR RELIEF

WHEREFORE, JPMorgan respectfully requests that the Court enter judgment against Defendants as follows:

1.    Permanently enjoin Defendants from prosecuting the California Action against JPMorgan;

2.    Award JPMorgan damages in an amount to be proven at trial;

3.    An order rendering the declaratory judgment requested above;

4.    Award JPMorgan its costs and attorneys' fees as permitted by law; and

5.    Grant such other and further relief as the Court deems just and proper.

Dated: New York, New York                Respectfully Submitted,
       February 10, 2026

*/s/ Robert A. Sacks*

    Robert A. Sacks
    (sacksr@sullcrom.com)
    Beth D. Newton
    (newtonb@sullcrom.com)
    SULLIVAN & CROMWELL LLP
    125 Broad Street
    New York, New York 10004
    Telephone:    (212) 558-4000
    Facsimile:    (212) 558-3588

    Paul H. Lazarow (*pro hac vice* application to be filed)
    (lazarowp@sullcrom.com)
    SULLIVAN & CROMWELL LLP
    550 Hamilton Avenue
    Palo Alto, California 94301
    Telephone:    (650) 461-5600
    Facsimile:    (650) 461-5700

    *Counsel for Plaintiff JPMorgan Chase & Co.*