USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/17/26

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JPMORGAN CHASE & CO.,

Plaintiff,

- against -

CITY OF RICHMOND ET AL.,

Defendants.

**26-CV-1143 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff JPMorgan Chase & Co. ("JPMorgan") brings this action against defendants City of Richmond and the Richmond Joint Powers Financing Authority (collectively, "Richmond" or "Defendants"). JPMorgan alleges that a 2015 settlement agreement entered in a proceeding in this Court bars an action currently pending in the Northern District of California. (See "Complaint" or "Compl.", Dkt. No. 7.) Before the Court is Defendants' motion to dismiss JPMorgan's Complaint. (See "Motion" or "Mot.", Dkt. No. 26.) For the reasons set forth below, Defendants' motion to dismiss is **GRANTED**.

## I. BACKGROUND[1]

This litigation arises from Richmond's suit against JPMorgan, alleging violations of the California False Claims

[1] The following facts are taken from JPMorgan's Complaint, which the Court takes as true for the purpose of resolving Defendants' motion to dismiss. See Safka Holdings LLC v. iPlay, Inc., 42 F. Supp. 3d 488, 491 (S.D.N.Y. 2013). Where indicated, the Complaint's factual allegations are supplemented by facts and information drawn from documents appended to

Act, currently pending in the Northern District of California (the "FCA Action").[2] (See Compl. ¶¶ 3, 22-23.) In its Complaint, JPMorgan asserts that the FCA Action is barred by a 2015 Settlement Agreement (the "Settlement Agreement") entered in a case in this Court, In re Municipal Derivatives Antitrust Litigation, MDL No. 1950, Dkt. No. 08-02516 (S.D.N.Y.) (the "MDL"). (See Compl. ¶¶ 4, 22-33.)

A. CLAIMS BROUGHT IN THE ANTITRUST MDL[3]

The MDL was an antitrust action in which various California municipal entities, including Richmond, alleged that JPMorgan, among other corporate defendants, conspired to "illegally rig bids, fix prices and manipulate the market for investment instruments known as municipal derivatives." Hinds Cnty., Miss. v. Wachovia Bank N.A., 708 F. Supp. 2d 348, 353 (S.D.N.Y. 2010) (internal citations omitted). Richmond's operative complaint in the MDL alleged that "[a]s a result of the industry-wide and inter-transactional quality of the

---

the Complaint. See Tannerite Sports, LLC v. NBCUniversal Media LLC, 135 F. Supp. 3d 219, 225 n.1 (S.D.N.Y. 2015).

[2] See City of Richmond, et al. v. Royal Bank of Canada, et al., No. 3:25-CV-03380 (N.D. Cal. Apr. 16, 2025).

[3] Because the Complaint references filings in the MDL proceeding, which is related to this case, "the Court takes judicial notice of filings, documents, transcripts, and orders in that proceeding." 7thonline, Inc. v. Colony Brands, Inc., No. 25-CV-2418, 2025 WL 2172514, at *1 n.1 (S.D.N.Y. July 31, 2025). See also Jianjun Lou v. Trutex, Inc., 872 F. Supp. 2d 344, 350 n.6 (S.D.N.Y. 2012) ("In the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case sub judice.").

Defendants' illegal conspiracy, all of the Municipal Derivative transactions entered into by Richmond during the period of the conspiracy were affected by the conspiracy and Richmond was injured thereby." (MDL Dkt. No. 1300 at 171.) In the MDL, JPMorgan characterized the action as having alleged a "single, massive, industry-wide conspiracy." (MDL Dkt. No. 485 at 4.)

B. THE SETTLEMENT AGREEMENT

On December 14, 2015, JPMorgan and several municipal entities, including Richmond, entered into the Settlement Agreement to resolve the state and federal antitrust claims alleged in the MDL. (See generally Settlement Agreement.) The Recitals in the Settlement Agreement state that the settling plaintiffs alleged Defendants violated federal and state antitrust statutes, including Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by "illegally rigging bids, limiting competition, and fixing prices in the alleged market for Municipal Derivative Transactions." (Id. at 2.)

Several defined terms in the Settlement Agreement are relevant to the present dispute. The Settlement Agreement's definition of "Releasors" includes the City of Richmond, the Richmond Joint Powers Financing Authority, and Richmond Community Redevelopment Agency, among others. (See id. § (A)(1)(m).) "Releasees", per the Settlement Agreement,

includes JPMorgan, as well as its "predecessors, including but not limited to Bear, Stearns, & Co., Inc." ("Bear Stearns") (Id. § (A)(1)(l).) "Released Claims" is defined in the Settlement Agreement as claims "arising out of or related in any way to the purchase or sale of Municipal Derivative Transactions . . . or relating in any way to any conduct alleged in the Actions or that could have been alleged in the Actions." (Id. § (A)(1)(k).)

Further, "Municipal Derivative Transactions" are defined as "any transactions that government . . . entities eligible to issue tax-exempt debt now use or have used at any time since January 1, 1992 to (i) invest the proceeds of tax-exempt debt offerings or (ii) hedge or manage the interest rate risk associated with such debt offerings." (Id. § (A)(1)(f).) The second sentence of clause (A)(1)(f) lists examples of those investment vehicles, such as swaps, options, and "all of the types of transactions described in the complaints and amendments thereto filed by Plaintiffs in the Actions, including" those alleged in two antitrust cases. (Id.)

C. CLAIMS BROUGHT IN THE FCA ACTION

On March 17, 2025, Richmond filed the FCA Action against JPMorgan and the Royal Bank of Canada ("RBC") in California state court. (See Compl. ¶ 22.) Before service, JPMorgan and

RBC removed the action to the Northern District of California. (See id.) Richmond filed an amended complaint on December 5, 2025, (see id.; Dkt. No. 7-2), and the operative Second Amended Complaint on March 10, 2026. (See "Richmond Complaint" or "Richmond Compl.", Dkt. No. 29-1.)

In the FCA Action, Richmond alleges that certain interest rate swaps related to Richmond's Series 2005 Pension Obligation Bonds (the "POB Swaps"), entered into by JPMorgan's predecessor, Bear Stearns, and Richmond in 2007 were *ultra vires*. (See Compl. ¶ 22; Richmond Compl. ¶¶ 178–255, ¶ 5.) Specifically, the POB Swaps allegedly met neither of two statutory rating requirements, rendering them false claims under the California False Claims Act. (See Richmond Compl. ¶¶ 50–77, 247, 390-402.) Richmond also alleges that JPMorgan, through its predecessor Bear Stearns, fraudulently induced Richmond to enter the POB Swaps by failing to disclose material information regarding those transactions. (See Richmond Compl. ¶¶ 390–396.) It is undisputed that the POB Swaps are state tax-exempt but federally taxable. (See Compl. ¶ 25.)

D. PROCEDURAL HISTORY

The 2015 Settlement Agreement vests this Court with "exclusive jurisdiction over the implementation and enforcement" of the Settlement Agreement. (Settlement

Agreement § (F)(2).) After Richmond filed the FCA Action in California, JPMorgan initially sought leave to enforce the release and covenant not to sue in the MDL where the Settlement Agreement was first entered. (See MDL Dkt. No. 2076). This Court ruled that enforcement of the Settlement Agreement must be brought in an independent action. (See MDL Dkt. No. 2080).

On February 11, 2026, JPMorgan filed its Complaint in this case. (See Compl.) After the parties exchanged pre-motion letters, (see Dkt. Nos. 15-17), Richmond filed its motion to dismiss the Complaint along with a supporting memorandum of law on June 5, 2026. (See Dkt. Nos. 24-27.) On June 11, 2026, JPMorgan filed a memorandum of law in opposition. (See "Opposition" or "Opp'n", Dkt. No. 28.) On June 15, 2026, Richmond filed a reply memorandum in support of its motion. (See "Reply", Dkt. No. 30.)

## II. LEGAL STANDARD

### A. STANDARD FOR A RULE 12(B)(6) MOTION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible if the complaint states "'enough fact to raise a reasonable

expectation that discovery will reveal evidence of illegal' conduct" — there is no "probability requirement at the pleading stage." Lynch v. City of New York, 952 F.3d 67, 75 (2d Cir. 2020) (quoting Twombly, 550 U.S. at 556); see Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). "In other words, a complaint should not be dismissed when the factual allegations sufficiently 'raise a right to relief above the speculative level.'" Liboy v. Russ, No. 22-CV-10334, 2023 WL 6386889, at *4 (S.D.N.Y. Sept. 29, 2023) (quoting Twombly, 550 U.S. at 555).

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (citation omitted). The Court may also "consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings in order to determine if a complaint should survive a [Rule] 12(b)(6) motion." Garcia v. Lewis, No. 05-CV-1153, 2005 WL 1423253, *3 (S.D.N.Y. June 16, 2005); see also ATSI Commc'ns, Inc. v.

Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) ("[W]e may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

B. STANDARD FOR BREACH OF RELEASE CLAIM

The parties agree that New York law governs. (See Mot. at 6; Opp'n. at 9-10, 17.)[4] "Settlement agreements are contracts and must therefore be construed according to general principles of contract law." Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999). "At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir. 2016) (internal citation omitted). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." Id. The Court analyzes ambiguity "under the normal rules of contract interpretation: words and phrases should be given their plain

[4] The parties agree that New York law controls this Court's interpretation of the Settlement Agreement, "and such implied consent ... is sufficient to establish choice of law." Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (internal citations and quotations omitted); see also Barshay v. Naithani, No. 20-CV-8579, 2023 WL 2051170, at *7 n.5 (S.D.N.Y. Feb. 16, 2023), aff'd, No. 23-382, 2023 WL 8708424 (2d Cir. Dec. 18, 2023).

meaning and a contract should be construed so as to give full meaning and effect to all of its provisions." Id. (internal citations and quotations omitted).

## III. DISCUSSION

JPMorgan argues that the FCA Action is barred by the 2015 Settlement Agreement for two reasons. First, JPMorgan asserts that the FCA Action claims are "Released Claims" under the Settlement Agreement because they arise out of or relate to the purchase or sale of Municipal Derivative Transactions. Second, JPMorgan contends that Richmond's claims in the FCA Action are "Released Claims" that relate to conduct that was or could have been alleged in the MDL. The Court is not persuaded by either argument.

### A. WHETHER FCA ACTION CLAIMS ARISE OUT OF OR RELATE TO MUNICIPAL DERIVATIVE TRANSACTIONS

JPMorgan first argues that the Settlement Agreement bars the FCA Action claims because they fall within the Settlement Agreement's definition of "Released Claims" as Municipal Derivative Transactions. (See Compl. ¶¶ 2, 24.) JPMorgan alleges that the POB Swaps, which it acknowledges are "state tax-exempt but federally taxable[,] are tax-exempt debt offerings" under the Settlement Agreement. (Id. ¶ 25.)

Richmond responds that the POB Swaps are not Municipal Derivative Transactions as defined by the Settlement

Agreement because they are neither tax-exempt debt offerings nor associated with such debt offerings. (See Mot. at 7.) Richmond argues that JPMorgan's reading of "tax-exempt debt offerings to mean state tax-exempt even if a municipal bond is not federally tax-exempt is not plausible." (Id.) (cleaned up).

The Settlement Agreement unambiguously defines "Municipal Derivative Transactions" as "any transactions that government . . . entities eligible to issue tax-exempt debt" have used "to (i) invest the proceeds of tax-exempt debt offerings or (ii) hedge or manage the interest rate risk associated with such debt offerings." (Settlement Agreement § A(1)(f).) In interpreting a settlement agreement "under New York law, words and phrases . . . should be given their plain meaning." ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co., 564 F.3d 81, 88 (2d Cir. 2009) (internal quotations and citations omitted). By its plain meaning, "tax-exempt" describes "a product, service, or financial arrangement on which no taxes have to be paid." Tax-exempt, Dictionary.Cambridge.org, https://dictionary.cambridge.org/dictionary/english/tax-exempt; see also tax-exempt, Dictionary.com, https://www.dictionary.com/browse/tax-exempt. Simply put, a tax-exempt debt offering does not mean a federally taxable

offering, even if that offering is exempt from state-tax. See ReliaStar Life Ins. Co. of N.Y., 564 F.3d at 88.

JPMorgan does not dispute the plain meaning of "tax-exempt." (See generally Compl.; Opp'n.) Instead, JPMorgan claims that the Settlement Agreement "unambiguously define[s] 'tax-exempt debt offerings' to include offerings based on bonds that were state tax-exempt, even if they were federally taxable." (Opp'n at 13; see Compl. ¶¶ 25-26.)

While it is true that "the agreed-to definition generally supersedes any other meaning of" an expressly defined contractual term, In re Orion HealthCorp, Inc., No. CV 23-3849, 2024 WL 4107233, at *8 (E.D.N.Y. Sept. 5, 2024), "tax-exempt" is not expressly defined in the Settlement Agreement. Section A(1) of the Settlement Agreement contains several "agreed-to" definitions but does not explicitly define "tax-exempt." (See Settlement Agreement § A(1).) The fact that the parties saw no need to define "tax-exempt" in the definitions section of the Settlement Agreement suggests that the "plain meaning" of tax-exempt controls. See Federal Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 568 (2d Cir. 2011) (holding that undefined terms in a contract should be given their ordinary meaning.)

To circumvent the plain meaning of "tax-exempt" debt offerings, JPMorgan argues that the federally taxable POB

Swaps at issue in the FCA Action qualify as tax-exempt debt offerings, and therefore released claims, for two independent reasons. (See Compl. ¶ 25; Opp'n at 10-16.) First, JPMorgan argues that the Settlement Agreement incorporates all of the types of the transactions described in the MDL complaints into the definition of Municipal Derivative Transactions. (See Opp'n at 12; Settlement Agreement § A(1)(f).) Second, JPMorgan contends that its interpretation does not improperly exclude the claims that two settling plaintiffs asserted in the MDL. (See Opp'n at 14.) The Court addresses each argument in turn.

1. Incorporation by Reference

JPMorgan first argues that the federally taxable POB Swaps meet the Settlement Agreement's definition of Municipal Derivative Transactions because that definition incorporates "all of the types of transactions described in" the settling plaintiffs' MDL complaints, and two of the approximately one hundred derivative transactions concerned federally taxable bonds. (See Opp'n at 10-14.) Richmond counters that the types of transactions in clause (*l*) as well as the examples in (a) through (k) of section A(1)(f) merely identify the types of transactions that "*may* meet the definition of Municipal Derivative Transactions, *but only* if" they relate to tax-exempt debt offerings. (Reply at 3 (emphasis in original).)

The Court is not persuaded that the federally taxable derivatives were incorporated by reference such that "tax-exempt" includes federally taxable transactions.

"To determine whether a contract has incorporated a document by reference, courts look to whether a reasonable person would understand the specific document to be incorporated by reference, in other words, an objective standard." Miller v. Mercuria Energy Trading, Inc., 291 F. Supp. 3d 509, 517 (S.D.N.Y. 2018), aff'd, 774 F. App'x 714 (2d Cir. 2019). "Courts consider two factors in making this determination: (1) whether the allegedly incorporated document is expressly identified and so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt[,] and (2) whether the language incorporating the document clearly communicates that the purpose of the reference is to incorporate the referenced material into the contract." Id. (internal citations omitted).

Here, the Settlement Agreement provides, in relevant part:

> "Municipal Derivative Transactions" means any transactions that government, quasi-government, non-profit, private and other entities eligible to issue tax-exempt debt now use or have used at any time since January 1, 1992 to (i) invest the proceeds of tax-exempt debt offerings or (ii) hedge or manage the interest rate risk associated with

> such debt offerings. These investment vehicles include, but are not limited to, the following types of transactions: (a) guaranteed investment contracts, or "GICs", both collateralized and uncollateralized; (b) forward purchase, forward supply and forward delivery agreements; (c) repurchase agreements; (d) certificates of deposit or "CDs"; (e) escrow agreements; (f) swaps; (g) options; (h) "swaptions"; (i) floors; (j) caps; (k) collars; and (l) all of the types of transactions described in the complaints and amendments thereto filed by Plaintiffs in the Actions, including but not limited to [certain paragraphs in the complaints of settling MDL entities].

(Settlement Agreement § A(1)(f).)

It is true that clause (*l*) of section A(1)(f) provides that the investment vehicles mentioned in the prior sentence include "all types of transactions described in the complaints and amendments thereto filed by [settling MDL] Plaintiffs" and acknowledges specific paragraphs in certain complaints that provide further explanation of the types of investment vehicles in clauses (a) through (k). (Id.) It is also undisputed that the MDL complaints filed by two settling plaintiffs — Stockton and Riverside[5] — alleged claims related to federally taxable transactions. (See MDL Dkt. No. 1301 at

[5] Here, "Stockton" refers to the City of Stockton, the Redevelopment Agency of the City of Stockton, and the Public Financing Authority of the City of Stockton. "Riverside" refers to the City of Riverside, the Redevelopment Agency of the City of Riverside, and the Public Financing Authority of the City of Riverside. As indicated above, the Court takes judicial notice of the two MDL complaints filed by Stockton and Riverside, respectively, that JPMorgan points to. (See MDL Dkt. No. 1301 at 206-07; MDL Dkt. No. 1296 at 168-69; MDL Dkt. No. 1297 at 168-69.)

206-07; MDL Dkt. No. 1296 at 168-69; MDL Dkt. No. 1297 at 168-69.)

But this does not necessarily mean that the Settlement Agreement incorporated the Stockton and Riverside MDL complaints as operative instruments. As to the first factor courts consider in evaluating incorporation by reference, "the allegedly incorporated document[s]" – the Stockton and Riverside complaints – are not "expressly identified and so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt." Miller, 291 F. Supp. 3d at 517. Section A(1)(f) neither identifies the two derivatives mentioned in the Stockton and Riverside complaints nor cites the Stockton or Riverside complaints. (See Settlement Agreement § A(1)(f).) Instead, section A(1)(f) references certain paragraphs in two *other* settling MDL complaints that neither party alleges contains references to federally taxable transactions. (See id.)

As to the second factor, "the language incorporating the document" also does not "clearly communicate[] that the purpose of the reference is to incorporate the referenced material into the contract." See Miller, 291 F. Supp. 3d at 517. Unlike the case in North Atlantic States Regional Council of Carpenters, Local Union No. 290 v. T20 World Cup USA, Inc., where an agreement incorporated a collective bargaining

agreement with the phrase "in accordance with the terms and conditions," the operative language here includes no similar phrasing. No. 24-CV-07172, 2025 WL 1434272, at *5 (E.D.N.Y. May 19, 2025). The at-issue clause, the second sentence of section A(1)(f), merely refers to "types of transactions" as examples of Municipal Derivative Transactions and points to certain paragraphs within the complaints, none of which identified federally taxable transactions. (See Settlement Agreement § A(1)(f).)

Nor does the word "including" in section A(1)(f)(*l*) broaden the definition of Municipal Derivative Transactions. "Normally, an 'including' clause cannot be read to expand the scope of the main, independent clause to which it is subordinate." Mercedez v. Compass Grp. USA, Inc., 824 F. Supp. 3d 448, 474 (S.D.N.Y. 2026). In contrast to JPMorgan's primary authority, HK Kolmar USA, LLC v. Wormser Corp., 813 F. Supp. 3d 430 (S.D.N.Y. 2025), where the clause at-issue lacked any general words following specific ones, the *ejusdem generis* canon of construction applies here. *Ejusdem generis* instructs that "where general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated." United States v. Dauray, 215 F.3d 257, 262 (2d Cir. 2000) (internal citations and quotations omitted).

In this case, Section A(1)(f) first sets forth a specific definition of Municipal Derivative Transactions. (See Settlement Agreement § A(1)(f).) The second sentence then provides a list of general examples of Municipal Derivative Transactions. (See id.) It would be "illogical to read the examples [] as embracing something that falls outside the scope of" tax-exempt Municipal Derivative Transactions. Mercedez, 824 F. Supp. 3d at 474. Therefore, the second sentence of Section A(1)(f) does not expand the scope of Municipal Derivative Transactions to include debt offerings that are state tax-exempt but federally taxable.

In sum, section A(1)(f) meets neither of the "incorporation by reference" factors. It is unlikely that "a reasonable person would understand the [the Stockton and Riverside complaints] to be incorporated by reference." See Miller, 291 F. Supp. 3d at 517. Accordingly, the reference to other types of transactions in the settling MDL complaints does not rewrite tax-exempt debt offerings to mean federally taxable transactions.

2. Exclusion of Claims Asserted in the MDL

JPMorgan next argues that Richmond's interpretation is wrong because it "would exclude from the scope of Municipal Derivative Transactions claims that settling plaintiffs *in fact asserted* in the underlying litigation, such as

Riverside's and Stockton's claims arising from federally taxable/state tax-exempt bonds." (Opp'n at 14 (emphasis in original).) Emphasizing the Settlement Agreement's broad language and intent to effectuate a global settlement, JPMorgan maintains that Richmond's reading would render certain provisions superfluous. (See id. at 14-15.)

JPMorgan is incorrect. It overlooks that the Settlement Agreement defines "Released Claims" as "any and all manner of claims . . . asserted." (Settlement Agreement § A(1)(k).) The claims at issue in the Riverside and Stockton complaints were released because they were actually asserted, not necessarily because they merely concerned derivatives that were Municipal Derivative Transactions.

Considering the phrase's plain meaning, the terms of the Settlement Agreement, and case law, the Court finds that "tax-exempt debt offerings" in the Settlement Agreement means exempt from state and federal tax. This Court declines JPMorgan's request to "distort the meaning of" tax-exempt debt offerings to mean federally taxable debt offerings. See Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475 (2004) (courts may not "add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties" (internal quotations omitted)). Thus, the POB Swaps at issue in the FCA Action are not

Municipal Derivative Transactions under the Settlement Agreement because the POB Swaps are federally taxable, and the definition of Municipal Derivative Transactions embraces only state and federal tax-exempt transactions. The FCA Action claims are accordingly not barred on this basis.

B. CONDUCT THAT WAS OR COULD HAVE BEEN ALLEGED IN THE MDL

JPMorgan next contends that Richmond's claims in the FCA Action are "Released Claims" that relate to conduct that was or could have been alleged in the MDL.

JPMorgan's fallback argument also fails. The Complaint does not plausibly allege that Richmond's claims in the FCA Action relate to conduct that was alleged or could have been alleged in the MDL.

"A release is a species of contract and is governed by principles of contract law." Golden Pac. Bancorp v. F.D.I.C., 273 F.3d 509, 514 (2d Cir. 2001) (internal citations and quotations omitted). "[A] release may not be read to cover matters which the parties did not desire or intend to dispose of." Consol. Edison, Inc. v. Ne. Utilities, 332 F. Supp. 2d 639, 647 (S.D.N.Y. 2004) (internal citations omitted). "Indeed, because releases in settlement agreements often contain recycled boilerplate language, 'courts applying New York Law have more carefully scrutinized the context and language used in releases to ascertain whether a given dispute

or transaction falls within a given release's scope.'" Murray v. City of New York, No. 23-CV-10031, 2024 WL 3553266, at *5 (S.D.N.Y. July 26, 2024) (quoting Barshay v. Naithani, No. 20-CV-8579, 2023 WL 2051170, at *9 (S.D.N.Y. Feb. 16, 2023), aff'd, No. 23-382, 2023 WL 8708424 (2d Cir. Dec. 18, 2023)). "'The scope of a general release depends on the controversy being settled and the purpose for which the release is actually given.'" Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, No. 12-CV-3723, 2017 WL 985875, at *6 (S.D.N.Y. Mar. 10, 2017) (quoting Broyhill Furniture Indus., Inc. v. Hudson Furniture Galleries, LLC, 61 A.D.3d 554, 555 (1st Dep't 2009)).

JPMorgan argues that Richmond's claims in the FCA Action are barred by the Settlement Agreement because those claims fall within the Settlement Agreement's definition of "Released Claims." (See Compl. ¶ 27; Settlement Agreement § A(1)(k).) JPMorgan relies on the following clause: "'Released Claims' means [claims] . . . relating in any way to any conduct alleged in the Actions or that could have been alleged in the Actions." (See Compl. ¶ 27; Settlement Agreement § A(1)(k).) Because the claims in the FCA Action concern certain financial instruments allegedly covered by the Settlement Agreement, JPMorgan argues that Richmond could have raised

those claims in the MDL and is foreclosed from bringing them now. (See Compl. ¶ 29.)

JPMorgan's argument is unavailing. To the extent the Settlement Agreement refers to claims concerning "any conduct alleged in the Actions or could have been alleged in the Actions," this phrase must be understood in the context of the "Actions" from which the claims arose: In re Municipal Derivatives Antitrust Litigation, MDL No. 1950, Dkt. No. 08-02516 (S.D.N.Y.) and its consolidated cases. (See Settlement Agreement § A(1)(a).) As the MDL's caption indicates, the MDL concerned various state and federal antitrust claims. (See MDL Dkt. No. 1300 at 171 ("As a result of the industry-wide and inter-transactional quality of the Defendants' illegal [antitrust] conspiracy, all of the Municipal Derivative transactions entered into by Richmond during the period of the conspiracy were affected by the conspiracy.").)

Reading the Settlement Agreement as a whole, other provisions make clear that the Settlement Agreement is limited to antitrust claims. See Consol. Edison, Inc., 332 F. Supp. 2d at 647. The Settlement Agreement's Recitals clause states that it covers conduct that violated various state and federal antitrust laws "by illegally rigging bids, limited competition, and fixing prices in the alleged market for Municipal Derivative Transactions." (Settlement Agreement at

2.) The reference to certain antitrust cases in the definitions of "Municipal Derivative Transactions" and "Released Claims" likewise confirms the limited scope of the Settlement Agreement. (See Settlement Agreement §§ A(1)(f), A(1)(k).)

The FCA Action, in contrast, has nothing to do with the industry-wide anticompetitive conduct alleged in the antitrust MDL. (See generally Richmond Compl.) As JPMorgan's complaint concedes, the MDL and the FCA Action "assert different legal theories." (Compl. ¶ 28.) Instead, the FCA Action alleges that JPMorgan and its predecessor, Bear Stearns, made false and misleading statements and omissions regarding POB Swaps, rendering the POB Swaps *ultra vires*. (See generally Richmond Compl.) The antitrust-focused Settlement Agreement simply cannot be reasonably read to reach the California False Claims Act claims regarding fraudulent inducement and false certification. (See Richmond Compl. ¶¶ 390-401.) Accordingly, Richmond's FCA Action is not barred by the Settlement Agreement.

Cases from this district reinforce this result. Consider Murray v. City of New York. No. 23-CV-10031, 2024 WL 3553266 (S.D.N.Y. July 26, 2024). There, the court reasoned that a retaliation suit was not barred by a settlement agreement because "[t]here [was] no overlap between the overtime

claims" resolved by a settlement agreement and the retaliation claims in the subsequent suit. See id. at *5. Similarly, in Consolidated Edison, Inc. v. Northeast Utilities, the court interpreted "potentially arise out of or relate in any way to the Merger Agreement" "in light of the reference to the claims in the Federal Litigation" to mean that a later suit involving claims not at issue in the Federal Litigation was not barred by the settlement agreement. 332 F. Supp. 2d 639, 648-49 (S.D.N.Y. 2004).[6]

For these reasons, the Court finds that the claims in the FCA Action do not relate to any conduct that was or could have been alleged in the MDL. Therefore, the FCA Action is not barred by the Settlement Agreement on this basis.

* * * * *

JPMorgan advances two arguments that contort the text of the antitrust MDL's Settlement Agreement to bar an action concerning different financial instruments and different conduct. The Court is not persuaded that the parties intended for the Settlement Agreement to foreclose unrelated lawsuits.

---

[6] JPMorgan argues that Consolidated Edison, Inc. v. Northeast Utilities 332 F. Supp. 2d 639 (S.D.N.Y. 2004) is inapposite because that case involved a release in a class action that was based on a standard not applicable here. (See Opp'n at 18.) While the prior settlement in the MDL was not of a class action, the Consolidated Edison court's analysis of whether a settlement agreement barred the subsequent action did not turn on standards unique to class actions. See 332 F. Supp. 2d at 646-49. Indeed, the generally applicable principles concerning the scope of a release in a settlement agreement are relevant here.

Nor is the Court persuaded that the Settlement Agreement in fact forecloses unrelated lawsuits. Accordingly, the Court holds that the Settlement Agreement in the MDL proceeding in this Court does not bar Richmond's claims in the FCA Action.

## IV. ORDER

For the foregoing reasons, it is hereby

**ORDERED** that the motion (Dkt. No. 26) of Defendants City of Richmond and the Richmond Join Powers Financing Authority (collectively, "Richmond" or "Defendants") to dismiss the Complaint (Dkt. No. 7) is **GRANTED**. It is further

**ORDERED** that Counts I and II of the Complaint are hereby **DISMISSED.**

The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

Dated: 17 November 2026
New York, New York



Victor Marrero
U.S.D.J.